IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SAVANNAH S. & BRYCIN S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SAVANNAH S. & BRYCIN S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BRITTANY N., APPELLANT.

Filed December 30, 2025.    No. A-25-348.

Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Ann C. Mangiameli, of Mangiameli Law Offices, L.L.C., for appellant.

Cara Stirts, Deputy Douglas County Attorney, for appellee.

Jane M. McNeil, of McNeil Cavanaugh Law, guardian ad litem.

PIRTLE, WELCH, and FREEMAN, Judges.

WELCH, Judge.

## I. INTRODUCTION

Brittany N., natural mother of Savannah S. and Brycin S., appeals the termination of her parental rights. Brittany's sole assignment of error is that the juvenile court erred in finding that termination of her parental rights was in the minor children's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Brittany is the biological mother of Savannah, who was born in March 2016, and Brycin, who was born in August 2020. On January 17, 2023, the State filed a supplemental petition alleging that Savannah and Brycin came within the meaning of Neb. Rev. Stat. § 43-247 (3)(a) (Reissue 2016) by reason of the fault or habits of Brittany. The petition alleged that the children's home was filthy and in an unwholesome condition; that a caseworker observed animal feces, the smell of urine, broken toys, dirty dishes, and trash throughout the house; that Brittany failed to provide Savannah and Brycin with proper parental care, support, supervision, and/or protection; that Brittany failed to provide the children with safe, stable and appropriate housing; and that the children were at risk for harm.

At the same time, the State filed an ex parte motion for immediate temporary custody of the children. In the attached affidavit in support of the ex parte motion for temporary custody, the case manager, Terri Knutson, alleged that DHHS began providing noncourt-involved services to the family in April 2022 following an intake that reported concerns relating to unsanitary living conditions, physical abuse by the father, domestic violence, alcohol abuse by Brittany, and educational neglect. After the initial intake, four more intakes were received over the span of 2 months. In an attempt to safely maintain the children in the home with their parents, the case manager developed a safety plan. The case manager asserted that the safety plan had been violated, and that Brittany and the children's father had limited communication and often made excuses for why they were unable to meet with the case manager at the family home. As part of a safety plan, DHHS offered services to the family including payment of an outstanding utility bill, cleaning supplies, family support, a co-occurring evaluation for Brittany, housecleaning including two dumpsters, parenting classes, assistance in finding safe housing, weekly meetings for safety assessment, and multidisciplinary team (MDT) staffing for additional resources. Despite the services offered, the family home remained unsanitary with animal feces, a mice infestation, a bed bug infestation, and an overall unhealthy living environment. In addition to the lack of communication and unsanitary living conditions, other intakes received by DHHS indicated possible concerns of sexual abuse of Savannah by a half-brother and a report by Omaha Public Schools officials who found concerning videos on a school-issued iPad which revealed the unsanitary conditions within the family home and lack of parental supervision.

The case manager asserted that removal of the children from the parental home was an immediate and urgent necessity due to a lack of progress despite ongoing services over a period of 9 months and ongoing concerns related to a lack of emotional support and significant risk for physical and emotional abuse as a result of Brittany's substance use, domestic violence, and conditions of the home. The court subsequently granted the State's request to remove the minor children from the parental home. The children were removed from the parental home on January 17, 2023.

Following a May 2023 adjudication and disposition hearing at which Brittany failed to appear, the juvenile court found that the children were juveniles within the meaning of § 43-247(3)(a) in that the family home had animal feces and trash throughout, the smell of urine, broken toys, and dirty dishes; that Brittany failed to provide the children with proper parental care,

support, supervision, and/or protection; that Brittany failed to provide the minor children with safe, stable, and/or appropriate housing; and that, due to these allegations, the minor children were at risk for harm. The court ordered that Brittany:

1. Follow the recommendations of the chemical dependency evaluation and complete intensive outpatient treatment;

2. Abstain from the use of illegal drugs, alcohol, and medications not prescribed by a licensed physician;

3. Cooperate with random drug and alcohol testing when requested;

4. Complete a psychological evaluation with a parenting risk assessment;

5. Work with family support services;

6. Obtain and maintain safe, stable housing and provide proof to the case manager;

7. Obtain and maintain a legal source of income, sufficient to sustain the health, safety and well-being of said children, and provide proof of income and employment to the case manager on a monthly basis;

8. Have reasonable rights of agency supervised parenting time, in a safe setting, that allows for close supervision of the children and privacy as arranged by [DHHS]; [and]

9. Comply with the [requirements] of Federal Probation.

The court also ordered DHHS to provide an initial diagnostic interview for Savannah and for mental health treatment if recommended.

An October 2023 "check order" stated that Brittany had completed her psychological evaluation with a parenting assessment and had no objection to the recommendations in the accompanying report and ordered Brittany to comply with the recommendations in the report. The court also ordered that Brittany's parenting time was to remain unsupervised, to include overnights, beginning with one overnight per week and increasing in frequency as determined by DHHS and the guardian ad litem as long as Brittany remained in compliance with the court-ordered rehabilitation plan and abstained from the use of illegal drugs, alcohol, and medications not prescribed by a physician.

In December 2023, the guardian ad litem and the State requested that Brittany's unsupervised visitation be suspended and that visitation be supervised due to her admitted use of methamphetamine, refusal to comply with regular probation drug testing, and dishonesty regarding the circumstances of Brittany's drug use and the inability to put a safety plan in place to address it. The court granted the ex parte motion and set the matter for a hearing, which was canceled after Brittany stipulated to her visitation being supervised.

During an April 2024 review and permanency planning hearing, the court continued the children's out-of-home placement, noted that Brittany did not participate in drug and alcohol testing in February and tested positive for methamphetamine at least twice in March, and ordered Brittany to continue participating in previously ordered services. The court also ordered Brittany to participate in family and individual therapy, maintain contact with the case professionals, cooperate with random drug testing arranged by DHHS, and complete intensive outpatient treatment.

On September 25, 2024, the State filed a motion to terminate Brittany's parental rights pursuant to Neb. Rev. Stat. § 43-292(2) (Reissue 2016) (substantial and continuous or repeated neglect), § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication), and § 43-292(7) (out-of-home placement for 15 out of last 22 months) and alleged that termination was in the best interests of the minor children.

The termination hearing was held over 2 days in January and March 2025. Witnesses included Lisa Utterback, the children's foster care provider; Dorothy Marshall, the director for family support and visitation, director of a day reporting center, and director of community based services; Sarah Valentine, a drug testing supervisor; Christopher (Chase) Ihle, a licensed independent mental health practitioner; Paige Hickey, a child and family services supervisor; Kellie Henley, a child and family services specialist; Jennifer Johnston, Brittany's mother; Emily Sutterlin, a peer support specialist; John Cleek, Brittany's former employer; Roy Wood, Brittany's friend; and Brittany.

### (a) Utterback's Testimony

Utterback testified that she became the foster care provider for 4-year-old Brycin and 8-year-old Savannah on August 15, 2024, and that the children have resided with her continuously since that time. She testified that the children get up around 7 a.m. and brush their teeth, comb their hair, and get dressed. The children have school during weekdays and on the way to school, Savannah reads aloud. Utterback picks up the children from school between 5 and 5:30 p.m. and, after they return home, the children do homework if they have any. Utterback and the children then usually walk the dogs or watch TV and have dinner together, during which they go around the table and talk about something good that had happened and something that did not go as well. After dinner, they clean up and Brycin takes his bath first, then Savannah takes her bath. After Brycin goes to bed between 7:45 p.m. and 8 p.m., Utterback and Savannah watch TV together and then Savannah goes to bed between 8:30 p.m. and 9 p.m.

According to Utterback, Savannah has extensive dental care needs and Brycin has followup visits for an eye surgery and he now wears glasses. The children also regularly attend therapy.

Utterback testified that Brittany initially had supervised visits with the children three times per week, but that the visits decreased to one supervised visit on Sundays. She further testified that Brittany's attendance at visits was inconsistent, which caused issues with the children including crying, bedwetting, and behavioral problems. Utterback testified that one time after Brittany failed to attend a scheduled visit in November 2024, Brycin hit some other children at daycare because he was angry "because my mom didn't show up." On another occasion in the fall of 2024, after a visit, Savannah expressed that she was worried that if they went back to Brittany's home, Brittany would allow Brycin to be abused. On a third occasion after Brittany failed to attend a visit, Savannah was very quiet and Brycin was crying. And within 3 weeks of the hearing, Savannah shared that Brittany had Savannah pee in a cup for Brittany's drug tests and Savannah found out afterwards that it was wrong. Utterback also confirmed that Brittany missed some visits in November 2024 because Brittany was incarcerated.

### (b) Marshall's Testimony

Marshall testified that, as director of community based services, she receives referrals from DHHS for families who have been court-ordered to follow through with services including psychological and psychiatric evaluations, services related to domestic abuse and sexual abuse, chemical dependency intervention, and areas such as food, shelter and transportation.

Marshall testified that they provided Brittany with family support services beginning in August 2024, and that they had previously provided visitation services a year earlier. Marshall testified that Brittany's family support goals included finding housing, locating and utilizing food pantries, obtaining employment, obtaining transportation, and attending parenting classes. Marshall testified that there was a lot of hesitation and cancellation by Brittany and sometimes Brittany would be a no-show.

### (c) Valentine's Testimony

Valentine testified that she was a drug testing supervisor and that between September 2023 and October 2024, her office received three different referrals for drug testing for Brittany, and that Brittany was discharged three different times. Valentine testified that Brittany was inconsistent with participating in drug testing; that in April 2024, Brittany was caught using an adulteration device to produce fake urine during the drug test; and that Brittany tested positive for amphetamines and methamphetamines on various occasions. Valentine's report, which included a total history of drug testing encounters with Brittany, was received into evidence during the trial as exhibit 67.

### (d) Ihle's Testimony

Ihle testified that he was a licensed mental health practitioner providing therapy services to Savannah since August 2023 and Brycin since May 2024. Ihle testified that he diagnosed Savannah with adjustment disorder with depression and recommended attachment-based therapy services. He further testified that he diagnosed Brycin with adjustment disorder with anxiety and recommended a similar therapy but with "a little bit more of a basic format" in addition to bereavement following the death of the children's father. Ihle testified that during therapy, both children indicated having concerns about whether to trust Brittany or the things she says to them. Following the children exhibiting behaviors and regression due to the inconsistency of visitation, Ihle testified that he recommended reducing Brittany's visitation with the children to one visit per week. Ihle testified that he believed that it was in the children's best interests for Brittany's parental rights to be terminated.

### (e) Hickey's Testimony

Hickey testified that she was assigned as the DHHS child and family services supervisor from May 2023 until November 2024. Hickey described as poor Brittany's progress towards reunification or alleviating the concerns that led to removal.

Although Hickey was not assigned until May 2023, her review of the case revealed that between June 2022 and January 2023 Brittany worked with noncourt services until the children were removed from the home due to concerns regarding the cleanliness of the home, substance use, and potential domestic violence.

Hickey testified that throughout the pendency of the case, Brittany was communicative with the case management team. However, Hickey testified that although Brittany had obtained employment and housing, and began participating in treatment and services, she did not maintain consistency with her case plan goals. Hickey testified that Brittany failed to provide proof of her employment during the pendency of the case; her housing situation remained unstable; she struggled to maintain sobriety despite entering into treatment three different times; she had been discharged from drug testing multiple times, was caught attempting to tamper or falsify the drug test results, and had tested positive for amphetamines and methamphetamine; and her visitation with her children was inconsistent, had been decreased, and had not progressed to unsupervised since December 2023. Hickey testified that despite the fact that there were periods where Brittany had done well, Brittany was unable to maintain any sort of consistency or stability in alleviating the concerns that led to the children's removal from her care.

### (f) Henley's Testimony

Henley testified that she took over as the case manager in November 2024. Henley testified that when she was assigned to the case, she had contact with Brittany at least once per month. She testified that Brittany had just recently been compliant with services including therapy, drug treatment, visitation, family support, and drug testing. Despite the recent compliance, Henley testified that she believed that termination of Brittany's parental rights was in Savannah and Brycin's best interests because

> [t]he children have been in out of home care for just a little over two years. She has not complied with her court orders, and she's not following her rehabilitation plan through the court orders.
>
> . . . .
>
> It's been through . . . the history of the case. Looking back at everything. There's been a lot of inconsistency throughout the whole entire case. We have at one point was -- we were at supervised visits and we went to unsupervised and we went back to supervised, then back to agency supervised and then back to agency supervised in a neutral location to one time a week. So throughout the case, instead of moving forward to unsupervised, we kept moving backwards.

Further, Henley testified that despite Brittany's compliance with some of the court orders, Brittany had still failed to provide proof of stable income or housing when she was not in inpatient treatment.

### (g) Johnston's Testimony

Johnston, Brittany's mother, testified that she maintained regular contact with Brittany and participated in some of her visits with the children. Johnston testified that Brittany was currently seeking inpatient treatment and that she was doing "really well there. She's supposed to get an apartment next week, I believe within the [treatment facility]." Johnston testified that she was doing well on her road to recovery and that her "number one top priority has always been her children. And doing whatever needs to be done to get them back and have a stable living arrangements [sic] with her children."

Sutterlin testified that she was Brittany's peer support specialist through the Wellbeing Initiative and that her role is "to offer support to people who might be struggling with substance use disorder and or mental health, or having experienced trauma." Sutterlin testified that she received a referral from CFS Hickey in August 2024 and that she generally meets with Brittany once a week. Sutterlin testified that she provided Brittany with transportation services and helped Brittany locate food and supplies for her visitation with the children. She testified that Brittany had been communicative with her and actively engaged in the service and voluntarily attended her codependency support group and participated in peer support. Sutterlin testified that termination of Brittany's parental rights would be a "great mistake" because

> I have seen her change so much since August, given -- and given all the setbacks that she's endured. And I just know that she is somebody who will turn her life around and at that time, to not have the chance to be reunited with her children would be to her detriment.

Sutterlin further testified that Brittany was always open and honest with her about bumps in the road or when she had relapsed.

### (i) Cleek's Testimony

Cleek testified that he owns and operates his own business remodeling houses and doing construction and that Brittany worked for him on and off starting about a year prior to the termination hearing. Cleek testified that Brittany worked between 30 and 40 hours per week and that although Brittany was not working for him due to her current inpatient treatment program and her employment was interrupted at points due to her incarcerations, she was "a good worker. She's welcome to come back whenever she's ready."

### (j) Wood's Testimony

Wood testified that he became friends with Brittany a few years ago and provided transportation to her whenever his work schedule permitted it. Wood testified that Brittany "seems to be doing a lot better, I think," and that she has told him "unequivocally" that it is her children that motivates her to get better. Wood testified that he had given rides to Brittany on numerous occasions including for visits with her children. Wood testified that while transporting her to a visit in November 2024, although Brittany was 5 minutes late, she was still within the 15-minute grace period for the visit, however, Brittany was denied the visit and was told that the children were no longer there.

### (k) Brittany's Testimony

Brittany testified on her own behalf. Brittany acknowledged that she had an issue with addiction but that she had finally started receiving the treatment she needed. Brittany testified that she had voluntarily engaged in treatment programs, parenting classes, and other services during the pendency of the case, and that she had done her best to ensure that she complied with her rehabilitation and case plan goals. Brittany testified that she participated in services through probation, drug court, and DHHS including drug testing, individual therapy, substance use treatment, family support, peer support, and that she had taken parenting classes, a victim impact

class, and had completed the CJC restorative justice program. Brittany further testified that she had not missed any visitation with her children since November 2024 and that she had not had a positive drug test since October 2024.

However, Brittany acknowledged that during the pendency of the case, she was incarcerated on three separate occasions. Brittany testified that after the children were removed in January 2023, she was arrested and incarcerated for 90 days in February 2023. Thereafter Brittany testified that she completed a 45-day treatment program. At that time, Brittany was also on federal probation for forgery, and after she relapsed, her probation was revoked and she was incarcerated again in July 2024. Brittany admitted that she had been incarcerated a third time in November 2024 following her arrest for possession of methamphetamine, however, she testified that she voluntarily pled no contest to the charges in order to have the opportunity to participate in drug court which began in December 2024.

As it related to the allegation that Brittany failed to maintain employment during the pendency of the case, Brittany testified that at the time the children were removed from her care in January 2023, she was employed as a transitioning specialist and that she maintained that employment until her arrest in July 2024. During that same time period, Brittany testified that she was working for Cleek doing remodeling, construction, and cleaning homes. Brittany stated that she continued to work for Cleek until she went into inpatient treatment in December 2024.

As it related to her housing stability, Brittany testified that prior to the children's removal, she had resided in the same home for 10 years. After her arrest in February 2023 and subsequent 90-day incarceration, Brittany testified that she was in residential treatment for about 45 days. Thereafter, Brittany moved in with her sister for a period of 6 months until she moved into a rental home. Brittany was subsequently evicted from the rental home after 6 months following a federal raid of the home for drugs and weapons. Brittany testified that she then moved into her mother's home in Logan, Iowa, about 45 minutes away from Omaha. Brittany testified that she resided with her mother until she was arrested for the second time in July 2024. Following her release from jail the following month, she moved in with a family friend who lived next door to her mother in Iowa until December 2024 when she entered inpatient treatment. Brittany acknowledged that she remained in inpatient treatment for 3 weeks before being asked to leave after staff members found methamphetamine in her belongings. Three days after leaving inpatient treatment, Brittany secured a bed at another inpatient treatment facility where she remained at the time of trial.

Brittany testified that she did not feel termination of her parental rights was appropriate at that time because she was actively taking significant steps to comply with the court orders. Brittany testified that in addition to complying with the court orders and case plan goals, the visits with her children went well; she had progressed to phase 2 in drug court; and had voluntarily engaged in other services and classes.

### 3. TERMINATION ORDER

Following the hearing, the court entered an order terminating Brittany's parental rights pursuant to § 43-292(2), (6), and (7), and that termination was in the minor children's best interests. Brittany has timely appealed the termination of her parental rights.

## III. ASSIGNMENT OF ERROR

Brittany's sole assignment of error is that the juvenile court erred in finding that termination of her parental rights was in the minor children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

## V. ANALYSIS

Brittany concedes that the minor children had been in out-of-home placement for 15 of the most recent 22 months prior to the start of the termination of parental rights hearing as set forth in § 43-292(7). She focuses her argument on the district court's finding that termination of her parental rights was in the minor children's best interests.

Before addressing whether termination of Brittany's parental rights is in the minor children's best interests, we note that the evidence establishes that the minor children were placed in the care and custody of DHHS on January 17, 2023, and they remained on out-of-home placement throughout the pendency of this case. At the time of the filing of the petition to terminate Brittany's parental rights on September 25, 2024, the children had been in out-of-home placement for 20 months. Accordingly, we find that the juvenile court did not err in finding that statutory grounds existed for termination of Brittany's parental rights under § 43-292(7). Further, if an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al*., 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because a statutory basis supporting termination of Brittany's parental rights was proven pursuant to § 42-292(7), we need not consider whether termination was also appropriate pursuant to § 42-292(2) and (6), and we proceed to consider whether termination of Brittany's parental rights was in the minor children's best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. § 43-292. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. Although the term "unfitness" is not expressly used in § 43-292, the concept is generally encompassed by the fault and neglect subsections of that statute and is also embedded in a determination of the child's best interests, which is under consideration in this appeal. *In re Interest of Noah C., supra*. We have defined parental unfitness as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which

caused, or probably will result in, detriment to a child's well-being." *Id.* Analysis of the minor child's best interests and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Here, the evidence shows that Brittany had ongoing issues with drug use throughout the pendency of this case despite having some periods of limited progress toward sobriety. During the pendency of the case, Brittany had been discharged at least twice from drug testing, the last of which occurred in October 2024 due to noncompliance. Brittany tested positive for methamphetamine on multiple occasions and was discharged from an inpatient treatment program after staff located methamphetamine in her personal belongings. Further, Brittany had been incarcerated on three separate occasions during the case, the most recent of which was in November 2024 after she was arrested for possession of a controlled substance. Although Brittany's visits with her children between October and December 2023 were unsupervised and included overnight visits, following a relapse and noncompliance with probation drug testing, the visits were ordered to be supervised. Brittany's visits never transitioned beyond supervised after the unsupervised visits were suspended, and eventually the visits were decreased from three visits per week to one visit per week due to Brittany's lack of consistency in attending the visits and regression in the children's behaviors as a result.

Further, Brittany also failed to remain in contact with her DHHS family support worker consistently, failed to maintain stable housing, and did not always provide proof of her employment income. Brittany's main argument here is that she has made progress with rehabilitation, is not unfit, and she should be provided more time to have the opportunity to reunite with her children. But, in addition to the profoundly devastating impact that Brittany's addiction has had on her children, the record does not suggest Brittany has made progress with her rehabilitation, nor does it suggest a reasonable possibility of reunification in the near future. As the guardian ad litem noted in her brief, by the time of trial, the children had been safely removed from Brittany's care for nearly 2 years, and when reviewing just the 6 months prior to trial, the record reveals:

- Brittany lived in Logan, IA, with her mother until July 2024;
- Brittany was arrested and jailed in July 2024 for 30 days for violation of federal probation;
- Brittany stayed with a family friend from August 2024 to December 2024 that lived next door to her mother in Logan, IA;
- Brittany was again jailed in November 2024 for possession of methamphetamine which caused her to miss weekly visits with her children;
- Brittany resided at an inpatient treatment facility from December 30, 2024, to January 17, 2025, until as she testified "[t]here was a tote that was brought to me by an ex . . . with some of my clothes and hangers and craft stuff like just different stuff to do there. And they did find drugs inside of that tote";
- By January 20, 2025, two days before the commencement of trial, Brittany moved into another residential treatment facility.

Based on the evidence presented, there has been minimal change by Brittany over the course of the case to alleviate the concerns that led to the children's removal. And, last minute

attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Savannah and Brycin need stability and permanency, and even with Brittany's most recent progress following the filing of the petition for termination, Brittany has not been able to put herself in a position to provide permanency for the children. Savannah and Brycin should not be made to await uncertain parental maturity. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *Id*. The 15-month condition contained in § 43-292(7) provides a reasonable timetable for parents to rehabilitate themselves. *Id*. Therefore, we find that the district court did not err in finding that termination of Brittany's parental rights was in Savannah and Brycin's best interests.

## VI. CONCLUSION

Having found that the district court did not err in finding statutory grounds existed and that termination was in the children's best interests, we affirm.

AFFIRMED.